UTAH, N. & C. R. CO. v. UTAH & C. RY. CO. et al.

(Circuit Court, D. Nevada.  July 22, 1901.)

No. 709.

1. CORPORATIONS—FORFEITURE OF FRANCHISE—CONDITION SUBSEQUENT.

The general rule is that, when the continued life of a corporation is made by the charter or governing statute to depend on a condition subsequent, the nonperformance of such condition is not an ipso facto forfeiture, but is a mere ground of forfeiture, of which the state may avail itself or which it may waive, so that, unless the state proceeds, by quo warranto or otherwise, to oust the corporation of its franchise, its existence cannot be collaterally called in question.

2. PUBLIC LANDS—RAILROAD RIGHT OF WAY—FORFEITURE.

The proviso in section 4 of Act March 3, 1875 (18 Stat. 482), granting right of way over the public lands to railroad companies, that, "if any section of said road shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any such uncompleted section of said road," is a condition subsequent, and the failure to complete the road within the time limited does not operate ipso facto as a revocation of the grant, but merely authorizes the government to forfeit it by judicial proceeding or by an act of congress resuming title to the lands.

3. SAME—CONFLICTING CLAIMS—PRIORITY.

As between two rival railroad companies, each claiming a right of way on the same route over public lands under the statute, that one is prior in right which first definitely adopts the line on which its road is to be built by appropriate corporate action, and then files its map of the location so adopted, since that is an essential act to initiate any right to a particular location. It is immaterial which first entered on the land to make surveys or to do other work thereon prior to such definite location.

4. SAME—RIGHT TO PRELIMINARY INJUNCTION.

A railroad company located its line of road over public lands of the United States, and proceeded, in accordance with the provisions of Act March 3, 1875 (18 Stat. 482), to acquire right of way across such lands. It graded and tunneled a portion of its road through a mountainous country, expending large sums in the work, but subsequently abandoned the line. Some 10 years afterwards a new company, allied to the first, was organized, which located its line over the same route and obtained a conveyance from the old company of its rights therein. It also filed its maps of survey with the land department for the purpose of acquiring the right of way over the public lands, and entered upon the work of completing the road. No action had ever been taken by the government to forfeit the rights of the old company in such right of way. Held, that the new company had acquired such prima facie rights in the work done by its predecessor as warranted a court of equity in granting a preliminary injunction restraining forcible interference with its completion of such work by a rival company, which also claimed the same right of way, but which did not definitely locate its line thereon

until later, pending an adjudication of the rights of the respective parties, but that the court would not, on such hearing, enter upon the question of the rights of the parties upon the portion of the line on which no work had been done, and as to which a contest was pending in the land department involving the validity of complainant's survey and maps of definite location.

In Equity.   On rule to show cause why injunction should not issue.

The subject-matter in controversy in this suit is the right of the complainant to hold and enjoy a certain right of way for a railroad through the state of Nevada.   This right of way is based upon the provisions of the act of congress entitled "An act granting to railroads the right of way through the public lands of the United States," approved March 3, 1875 (18 Stat. 482). On April 19, 1901, the Utah & California Railway Company conveyed all its rights and interests in the roadbed and right of way in Lincoln county, Nev., to the San Pedro, Los Angeles & Salt Lake Company.   The other defendants are the agents, attorneys, and servants of the respective corporations.   The conflict between the parties which resulted in the institution of the present suit was commenced by the order of the commissioner of the general land office, made January 16, 1901, directing a hearing before the local land office in Carson City, Nev., to determine the rights of the respective corporations to the rights of way herein involved.   Pursuant to said order, after notice duly given, this hearing was had March 11, 1901, and upon the proofs then submitted the register and receiver found the following facts:

"(1) That during the years between August 28, 1889, to and including February, 1890, the Oregon Short Line & Utah Northern Railway Company caused to be surveyed a line of route commencing at Milford, territory of Utah, and running in a westerly direction to within about four miles from the town of Pioche, in the county of Lincoln, state of Nevada, and between the same dates the said company caused to be graded a large portion of said roadbed, and constructed about 3½ miles of track leading from the town of Milford in a westerly direction; that in the year 1890 all grading and construction work was abandoned, and the 3½ miles of track theretofore laid was torn up and removed from said line or route, and since the year 1890 the said Oregon Short Line & Utah Northern Railway Company not having done any work or made any improvements upon its line of survey in the state of Nevada.   (2) That in the year 1893 the right of way and the grading done on said line of survey within the state of Nevada was assessed by the assessor of Lincoln county, state of Nevada, for state and county taxes, to the Oregon Short Line & Utah Northern Railway Company; that when the said taxes became due the said Oregon Short Line & Utah Northern Railway Company failed and refused to pay said taxes or any part thereof, and the said property was advertised and sold by the sheriff of Lincoln county, and was bid in by the treasurer of Lincoln county for the said county, and the said property has never been redeemed from said sale by the Oregon Short Line & Utah Northern Railway Company, or by any one in its behalf, and the tax title to said property is now vested in Lincoln county, for the use and benefit of said county and the state of Nevada.   (3) That by reason of the fact that the Oregon Short Line & Utah Northern Railway Company has not complied with the provisions of section 4 of the act of congress of March 3, 1875, concerning rights of way for railroads over public land, that company has forfeited all rights, and privileges it had under its survey reverted to the government in the year 1896.   (4) That in the year 1896 the Utah & California Railway Company caused to be surveyed a line of route from the boundary line between the then territory of Utah, through the county of Lincoln, in the state of Nevada, and over the line theretofore surveyed by the Oregon Short Line & Utah Northern Railway Company; that prior to the date of said survey all rights and privileges obtained by the Oregon Short Line & Utah Northern Railway Company by its survey made in the years 1889 and 1890 had been forfeited to the government of the United States by reason of the fact that the said company had failed to comply with the act of congress of March 3, 1875, and the said Utah & California Railway Company

had the right to make the survey and locate its line of route over the said line theretofore surveyed and located by the said Oregon Short Line & Utah Northern Railway Company. (5) That certain maps offered in evidence by the Utah, Nevada & California Railroad Company, which had been returned by the honorable commissioner of the general land office at Washington, under date of September 16, 1899, for correction, and on the 25th day of December, 1899, forwarded by the register, by registered package, addressed to the Utah, Nevada & California Railroad Company, Salt Lake City, Utah, were not returned to the United States land office at Carson City, Nevada, or to the register or receiver thereof, until the 1st day of March, 1901, although the said registered package had been received and receipted for on the 23d day of November, 1899, by A. C. Cleveland, one of the directors of the Utah, Nevada & California Railroad Company; and, the said company not having made the corrections as called for by the honorable the commissioner's letter above referred to, for more than a year after receiving notice thereof, the said maps should not be filed. (6) That the attempted transfer of the Oregon Short Line & Utah Northern Railway Company to the Utah, Nevada & California Railroad Company is without merit, because at the date of the attempted transfer the said Oregon Short Line & Utah Northern Railway Company had no right or title to, or claim upon, the said right of way in the state of Nevada, that company having forfeited all right and claim to said right of way by failure to comply with the act of congress of March 3, 1875, as hereinbefore mentioned; and the claim that the Utah, Nevada & California Railroad Company is auxiliary to the Oregon Short Line & Utah Northern Railway Company is without merit, in so far as the said franchise is concerned. Our conclusions drawn from the foregoing facts are that the claims of the Oregon Short Line & Utah Northern Railway Company and the Utah, Nevada & California Railroad Company are without merit, the right under which they claim having been forfeited. We therefore recommend that the maps of the line of route as surveyed by them be rejected, and that the maps of the Utah & California Railway Company, filed in the United States land office at Carson City, state of Nevada, on the 27th day of February, 1897, as corrected, be approved, and that the said company be granted the right of way."

An appeal was taken from the decision of the local land office, and on April 24, 1901, the secretary of the interior rendered the following decision:

"The Commissioner of the General Land Office—Sir: With your office letter of the 23d instant were forwarded articles of incorporation and proofs of organization filed by the Utah & California Railway Company and the Utah, Nevada & California Railroad Company, together with maps of location filed by said companies, respectively, and in said letter it is recommended that the articles of incorporation filed by the last-mentioned company be accepted and filed, and that the map of location showing the second section of road, filed by said company, be approved under the provisions of the act of March 3, 1875 (18 Stat. 482), so far as the same crosses surveyed public land. On May 3 and June 7, 1890, this department approved four maps of location filed by the Oregon Short Line & Utah Northern Railway Company, showing its line of route as surveyed and located from the Utah-Nevada boundary line, near the seventh standard parallel, by way of Cloverdale Junction, to a point near Pioche, Nev., a distance of 70.53 miles. Said company at an expense of several hundred thousand dollars graded nearly the entire line of its road as shown upon said maps, constructed tunnels, and did other work preliminary to the occupation and operation of a railroad upon said located line. It became financially embarrassed, and all of its property, including that above described, was purchased at foreclosure sale by the Oregon Short Line Railroad Company, a corporation organized under the laws of the state of Utah. The work of construction along this line was discontinued in 1890 or 1891, and was not resumed until during the present month, when the Utah, Nevada & California Railroad Company entered upon the construction of the line of road and is now actively proceeding therewith from the Utah-Nevada line towards Cloverdale Junction, Nev. The Utah, Nevada & California Railroad Company was incorporated in February, 1899, under the laws of the state of Nevada. Its articles of incorpo-

110 F.—56

ration and proofs of organization, as submitted, have been examined by your office and found to be satisfactory, and it is shown to be entitled to acquire a right of way and to construct and operate a railroad in the state of Nevada. Its maps of location, filed as before stated, show two sections of located road, beginning at the Utah-Nevada state line, and following the old line located by the Oregon Short Line & Utah Northern Railway Company to Cloverdale Junction, which maps your office finds fully conform to the regulations governing the filing of such maps. It is proceeding with the construction of the road along said line of location, with the consent of the Oregon Short Line Railroad Company and the Oregon Short Line & Utah Northern Railway Company. Indeed, it is an auxiliary to these companies. That the rights secured by the approval of the maps of location of the Oregon Short Line & Utah Northern Railway Company, in May and June, 1890, have not become forfeited merely by the failure of that company to construct and operate a railroad along said line of location within the period named in the fourth section of the act of March 3, 1875, supra, is, clearly settled by a long line of decisions (see U. S. v. Northern Pac. R. Co., 177 U. S. 435, 20 Sup. Ct. 706, 44 L. Ed. 836, and cases therein cited; also In re Spokane & P. Ry. Co., 26 Land Dec. Dep. Int. 224); but, as those claiming under said location have filed written consent to the approval of the maps of location filed by the Utah, Nevada & California Railroad Company, there is no reason why that company's maps may not be approved (In re Montana Ry. Co., 21 Land Dec. Dep. Int. 250; In re Noxon, 27 Land Dec. Dep. Int. 585). I have therefore accepted for filing the articles of incorporation and due proofs of organization submitted by the Utah, Nevada & California Railroad Company, and have approved its map showing the second section of the located road, so far as the same crosses surveyed public lands. As to the unsurveyed lands, the maps will be received for information only. The map showing the first section covers only unsurveyed land.

"It but remains to determine the rights of the Utah & California Railway Company. That company was organized under the laws of the state of Utah, and on June 20, 1896, asked approval, under the provisions of the act of March 3, 1875, supra, of four certain maps of location,—the line shown thereon being identical with that shown upon the approved maps of location filed by the Oregon Short Line & Utah Northern Railway Company, before referred to; and thereupon said last-mentioned company filed a protest against the approval of said maps. The articles of incorporation of the Utah & California Railway Company did not, at the time of the filing of said maps, authorize it to operate a railroad outside of the state of Utah, and it was not until January 2, 1901, that by an amendment of its articles of incorporation it became empowered to construct a line of road in Nevada, even if it could acquire authority so to do from the state of Utah alone. In January of the present year a hearing was ordered by your office at the Carson City, Nev., land office, which resulted in a decision by the register and receiver of that office holding that all rights secured by the approval of the maps of location filed by the Oregon Short Line & Utah Northern Railway Company in 1890 had become forfeited by its failure to construct such line of road within the time named in the act of March 3, 1875. That decision cannot be sustained. The land department cannot declare and enforce a forfeiture of this sort. Following the decision of said local land officers, the Utah & California Railway Company made an ineffectual attempt to take and hold possession of the grade constructed by the Oregon Short Line & Utah Northern Railway Company. It did some work thereon, but not enough to amount to more than a colorable attempt to construct a railroad. At the oral hearing had to-day in this matter, it was not claimed, nor does it seem that it could be, that there was any authority under the laws of Nevada, before about the middle of last month, for the construction and operation by a Utah corporation of a railroad wholly within the state of Nevada. It is represented that at the time named a law was enacted in that state (St. Nev. 1899, p. 32, c. 20) whereby such authority was given to corporations of other states upon their compliance with certain named conditions, and it is admitted that these conditions were not complied with by the Utah & California Railway Company prior to the 8th inst. No certified copy of this act

is presented, nor is a copy presented in any form which entitles it to recognition. This company, therefore, cannot even now be held or recognized as entitled to acquire a right of way within the state of Nevada, and this department must refuse to accept for filing its articles of incorporation and proofs of organization. Even if the recent Nevada statute were now before the department, and were shown to go as far as is claimed, the Utah, Nevada & California Railroad Company would be entitled to precedence, because—First, its application was the first to be presented in a perfected form showing a right in the company to acquire a right of way in Nevada; second, it is shown to have actively commenced construction of the line of road before the time when the other company claims to have complied with the recent Nevada statute; third, the obstacle which the outstanding Oregon Short Line & Utah Northern right of way presents to the granting of another right of way over the same ground has been removed as to the Utah, Nevada & California Company by the written consent of the holder filed in this proceeding; and, fourth, the existing grade and tunnels on this ground, placed there by the Oregon Short Line & Utah Northern Company at enormous cost, give its auxiliary company the stronger claim to recognition as between the two new companies, even if they are both willing and able to enter upon the actual construction and operation of a railroad upon said line of location. The Utah & California Railway Company's maps are therefore herewith returned without approval."

On April 6, 1901, soon after the decision of the local land office in their favor, the defendants entered upon the roadbed in question and commenced work thereon, and on the next day, April 7th, the complainant entered upon said roadbed and soon thereafter commenced work thereon, laying rails and performing other work necessary to be done in order to construct a line of railroad thereon, and has ever since been engaged in said construction. It is alleged in the original bill of complaint that the defendants, "at a point at or near tunnel No. 1, on said railroad grade, a distance of about 10½ miles from the said boundary line between the states of Utah and Nevada, at said point known as and called 'Uvada,' and at divers other places upon said grade, at a greater distance from said Uvada, forcibly entered upon said grade, roadbed, embankment, cuts, and tunnels, and constructed in and upon said line of right of way, near the said tunnel, a barbed-wire fence inclosing a cut upon said railroad grade and line, and across said right of way and roadbed, and have also built obstructions of trees and rocks at or near the said place, by hauling trees into cuts upon said line of right of way, and rolling from the banks of such cuts large rocks upon the said trees, thereby constituting an obstruction and barricade for the purpose of forcibly resisting and obstructing your orator, its agents and servants, in and about the work of continuing its construction, and completing and operating its said railroad upon said grade and roadbed. * * * That the said defendants, and their said agents, officers, servants, and employés, have confederated together for the purpose of, and with the intention of, by the means of the barricade, barbed-wire fence, and other contrivances aforesaid, and are designing and intending to, unlawfully, forcibly, and violently interfere with, obstruct, and prevent your orator from peaceably and lawfully occupying, possessing, using, and enjoying its said right of way and roadbed, and peaceably continuing to construct its railroad thereon." The answer denies the commission of any unlawful acts on the part of defendants, and, among other things, alleges "that on the 26th day of March, 1901, the San Pedro, Los Angeles & Salt Lake Railroad Company began a survey and location of right of way, in accordance with the laws of the United States, extending over the same ground and right of way described in plaintiff's bill, and finished the same as far as Clover Valley Junction on the 2d day of April, 1901, on which last date the said San Pedro, Los Angeles & Salt Lake Railroad Company began a survey and location of right of way over that part of the ground described in plaintiff's bill, extending from Clover Valley Junction to the head of Condor Canyon, near Pioche, in the county of Lincoln, state of Nevada, and completed the same on the 7th day of April, 1901, and on or about the 19th day of April, 1901, with the bona fide intention of building a railroad track and improvements thereon, in accordance with the laws

of the United States and the laws of the state of Nevada, and according to the terms of its franchise, took from the defendant the Utah & California Railway Company peaceable possession of said right of way and grade, and began to improve the same for the purposes of building a railroal track thereon, and remained continuously in possession of said right of way, and industriously prosecuted said work of improvement, until compelled to desist therefrom by an order of this honorable court."

Numerous affidavits were presented by the respective parties as to the character of the work done by said corporations on said roadbed. Those presented by complainant fully sustain the averments of its bill of complaint, and many of the acts performed by the defendants are not denied in any of the affidavits on their behalf; their proofs being principally confined to the statement that they were acting in good faith for the purpose of building a railroad on the line of the roadbed, to which they claim to have acquired a valid title, and that the complainant was a trespasser upon their rights, etc. · Among other things, the affidavits offered on behalf of complainant show that the work performed by defendants was without any definite design, and was not calculated to improve or repair said grade, but was a mere pretense of work, and done solely for the purpose of claiming to be in possession of said grade and preventing the construction of a railroad thereon; that after the arrival of complainant's servants and agents the men employed by defendants were instructed to put themselves in the way of obstructing the progress of the complainant; that, among other things, they "barricaded" the roadbed, constructed "a barbed-wire fence" across the roadbed, filled up a cut "with trees, rock, and other materials," and finally adopted a "dead line," beyond which they threatened complainant should not go, at which point they were "to make a stand and prevent the further progress" of complainant and its employés.

Jake Johnson, sheriff of Lincoln county, who had occasion in his official capacity to pass over said grade and roadbed frequently from April 9 to June 13, 1901, observed the work done thereon during the months of April and May, and knew one Virgil Kelly, who was in the employ of the San Pedro, Los Angeles & Salt Lake Railroad Company, under the direction of H. B. Maxson, one of the personal defendants herein, and had about 150 men under his charge. In his affidavit on behalf of complainant he says:

"On or about the 11th day of April, 1901, I visited the said Kelly's camp, having been informed that he was obstructing the construction of a railroad, and found that the said Kelly and his men were filling the cuts with trees and large boulders, and placing barriers on the roadbed to prevent the laying of ties and rails. I spoke to Maxson about it, and informed him that he, Kelly, and their men were obstructing, instead of building, a railroad, and that they must remove the obstructions, which they promised to do, and did remove afterwards; that the said men, under the supervision of the said Kelly and Maxson, were only pretending to work on said grade, and not to exceed one-half of them had any tools to work with, but were stationed along the grade to prevent the laying of track by the Utah, Nevada & California Railroad Company; * * * that on the 27th day of April, 1901, while the said Utah, Nevada & California Railroad Company was distributing ties along the line of said roadbed, about 9 miles southwesterly from Uvada, Kelly and his men moved up from a point about 3 miles further west, where they had barricaded a cut with barbed wire, trees, and rocks, and stopped the teams from unloading ties, and grabbed the horses, and would not permit them to unload, and the attorney representing Kelly and his men shouted for them to knock the horses down and not let them pass, and they did for more than three hours by force prevent the distribution of ties and other construction of the road; that the work performed by Kelly and his men was principally obstruction, and during the time they were employed on said grade they performed little or no work that could in any way be called legitimate railroad building or construction, but they did, however, construct about 40 feet of railroad, which consisted of rails of 19-pounds weight, nailed upon round pine and cedar ties with spikes and 10-penny wire nails, and that said track was laid a distance of over 2 miles from where the barbed-wire obstruction was placed, and at a point nearer Uvada; that there

was no necessity for making any barriers of wire, trees, or stone, for at no time during the month of April, and before the serving of the injunction, was the Utah, Nevada & California Railroad construction gang within a point nearer than 2 miles, and during the most of the time were a distance of from 4 to 7 miles, from said obstruction, and said obstructions were made several days before the 27th day of April, the time when said Utah, Nevada & California teams were prevented from laying ties, and long before the issuance or service of the injunction; that ever since the 8th day of April, 1901, the Utah, Nevada & California Railroad Company have been continuously, and now are, in the actual construction of a railroad from Uvada, Utah, to Clover Valley Junction, in said county of Lincoln, and are laying good, substantial rails and ties, and ballasting the same, and have a large force of men in the actual construction of a railroad; that I have no interest whatever in the said suit or controversy, and visited the grade during the month of April, 1901, and was there continuously for 20 days, with instructions from the county commissioners and district attorney of said county to prevent obstruction to track laying and preserve the peace and order of the county."

The affidavit of C. O. Whittemore, one of the personal defendants herein, and of counsel for the defendant corporations, who had the general supervision of the work done on said roadbed on behalf of the defendants, after denying several of the specific statements contained in some of the affidavits of persons who were at the time in the employ of defendants, states that "all of the men who were sent by affiant to work on said grade were instructed to repair the same as fast as practicable, and said men were also instructed to adopt such means as might be necessary, by barbed-wire fence and other barricades, to prevent the occupation and laying of track by the Oregon Short Line Company, or the plaintiff company, on that part of the grade repaired and leveled by the forces employed by the Utah & California Railway Company; and affiant further states that most, if not all, barricades were placed along each side of the grade, and not across the grade, and that all the barricades were constructed for the purpose of preventing the forcible occupation by the plaintiff company of the repaired grade, and to prevent the said plaintiff company from interfering with the work of the Utah & California Railway Company in repairing said grade."

It is alleged in the supplemental bill that since the filing of the original bill herein complainant has "caused surveys to be made of its line of location of its railroad, and caused maps and profiles to be prepared showing the line of right of way for its railroad from Clover Valley Junction * * * southwesterly across the state of Nevada and through the county of Lincoln, Nevada, to the western boundary of said state of Nevada, and that its said map and profiles of the route and line of its said right of way were submitted to the secretary of the interior, and by said secretary of the interior on the ——— day of ———, 1901, duly approved, all in pursuance to and in compliance with the terms of the statute of the United States; *, * * that it has duly adopted the line of right of way described upon and embraced in said maps and profiles as the line of right of way for its said railroad, and that it owns and holds the same under and by virtue of the said act of congress, the compliance of your orator therewith, and with the rules and regulations of the department of the interior made in respect thereto," —and prays that the defendants be further restrained and enjoined from entering upon this right of way and railroad grade.

After the testimony was in, the defendant, by leave of the court, introduced a letter bearing date June 21, 1901, from the commissioner of the general land office, directed to the register and receiver of the land office at Carson City, Nev., in which, among other things, the commissioner said:

"With your letter of May 16, 1901, you transmitted nine maps filed by the Utah, Nevada & California Railroad Company, showing the definite location of its line of road between the points described. The first 20-mile section, from Clover Valley Junction southwesterly, was filed in your office May 6, 1901, as appears from a memorandum signed by the register and transmitted with the papers. The rest of the line is shown on eight maps, which, according to a similar memorandum, were filed in your office May 11, 1901. On the days the maps were filed, protests against their acceptance were filed

in your office on behalf of the Utah & California Railway Company. On May 25, 1901, a protest was filed in your office on behalf of the San Pedro Company. The protests allege that the protesting companies were in possession, and working and surveying the said line of route, and having a corps of surveyors employed in the performance of said work. Upon examination it appears that the line of route submitted by the Utah, Nevada & California Railroad Company is made from the same field notes that were used for nine maps filed by the Oregon Short Line & Utah Northern Railway Company in 1890, and approved by the department on November 22, and December 29, 1890, under the act of March 3, 1875 (18 Stat. 482). The Utah, Nevada & California Railroad Company claims to have succeeded to all the rights of the Oregon Short Line Company as to this right of way. As to other lines in Nevada, the department has recognized this company as an auxiliary of the Oregon Short Line Company, and has confirmed it in the rights claimed (decision of April 24, 1901, not published). The questions raised by the protest are—First, whether the surveys made by the Utah, Nevada & California Railroad Company are such as would satisfy the requirements of the law and the regulations; and, second, whether the work done on the proposed right of way by the protestants is such as to give them any rights as against the grant of right of way which has vested in the Oregon Short Line Company, or as against the corporation in favor of which the Oregon Short Line Company has waived its rights. In the affidavits filed by the protestants are certain statements as to the methods in which the surveys of the Utah, Nevada & California Railroad Company was made, to the effect that stakes were set only at considerable intervals, and those that were set are not in many cases in conformity with the field notes. The affidavits allege, further, that the protestants have actually been engaged in construction upon the proposed line; the sum of $2,340.50 having been expended in grading thereon during the month of May, 1901. It appears that on May 25, 1901, the San Pedro Company filed two maps showing the first two 20-mile sections of the same route southwesterly from Clover Valley Junction, and on June 12, 1901, a map of the third 20-mile section. On May 25th and June 13th, respectively, the Utah, Nevada & California Railroad Company filed protests against the acceptance of these maps, alleging prior rights by reason of its claim through the Oregon Short Line Company, and by reason of the fact that it had already filed its maps for the same line of route. An examination of the maps discloses the fact that while there are some discrepancies between the San Pedro maps on the one hand, and the approved Oregon Short Line maps and those of the Utah, Nevada & California on the other, the differences are for the most part very small, and that the two rights of way claimed are practically identical. In order that the matter may be properly presented to this office for the determination of the rights of the parties, you are instructed to order a hearing for the purpose of determining the facts concerning the two questions of survey and of work done as hereinbefore specifically stated. You will give the parties due notice of the time set for the hearing, and after the conclusion thereof will render your decision as to the facts shown and allow the usual right of appeal; the entire proceeding to be conducted in accordance with the rules of practice. You will make prompt report and transmit all the papers in the case."

The amended and supplemental bill also sets out in hæc verba a judgment for $4,998.52, entered by default in April, 1894, in the district court of Lincoln county, state of Nevada, in the suit of the state of Nevada against the Oregon Short Line & Utah Northern Railway Company, brought for the collection of delinquent taxes on "possessory claim to surveyed right of way for a railroad of sixty-five miles, more or less, running from the state line on the east, southwest down Clover Valley Wash, thence north up Meadow Valley Wash, to within three miles of Pioche, with sixty miles, more or less, of prepared roadbed, consisting of cuts, fills, tunnels, etc., and known as the 'Milford and Pioche Line of the Oregon Short Line & Utah Northern Railway,' situated in Lincoln county, Nevada," and also sets out all of the proceedings had in said suit. It alleges, among other things, that the defendant the San Pedro, Los Angeles & Salt Lake Railroad Company has, or claims to have since the filing of the complainant's original bill, secured un-

der and by virtue of this judgment a title to the roadbed and right of way of this complainant from Uvada to Clover Valley Junction, and from thence to Pioche, by means of certain contracts and agreements made with the board of county commissioners of Lincoln county, Nev., and certain deeds from other parties. It further alleges that said judgment, and all the proceedings had in the suit in which it was entered, were without jurisdiction, and were and are absolutely null and void, and of no effect, and prays "that said San Pedro, Los Angeles & Salt Lake Railroad Company be enjoined and restrained from further asserting, setting up, or making any claim of right, title, or interest which it pretends to have acquired or to have under and by virtue of any contract, agreement, or conveyance from said Utah & California Railway Company, or under said pretended deed from James A. Nesbitt, treasurer of Lincoln county, Nev., or under said pretended contract made in the name of John Simpson, as chairman of the board of county commissioners of said Lincoln county, Nev., or otherwise, as to any of your orator's said right of way or property, and that each and every of the said pretended deeds, contracts, or agreements, instruments, or conveyances, issued or delivered by either of the said Utah & California Railway Company, the said James A. Nesbitt, treasurer, as aforesaid, and the said pretended contract from the county of Lincoln aforesaid, and the record of each and every of them, may be set aside and canceled, and all of the pretended title, claim, or interest of the said San Pedro, Los Angeles & Salt Lake Railroad Company, pretended to be held under them, or any of them, be held for naught."

During the argument the court's attention was called by defendants' counsel to the fact that on May 4, 1901 (subsequent to the filing of complainant's original bill, but prior to the filing of its amended and supplemental bill), complainant commenced a suit in the district court of Lincoln county, Nev., to set aside the judgment in the tax case on the ground that all proceedings therein were null and void; that the defendant railroad companies, though not made parties, have intervened therein as parties defendants; and that said suit is now pending in said court.

W. R. Kelly, P. L. Williams, C. S. Varian, and T. Coffin, for complainant.

T. E. Gibbon, C. O. Whittemore, and M. A. Murphy, for defendants.

HAWLEY, District Judge (after stating the facts). 1. The complainant on April 27, 1901, filed its bill of complaint and obtained an order requiring the defendants to appear and show cause why a preliminary injunction should not issue; and it appearing to the satisfaction of the court, from the averments of the bill, that there was danger of irreparable injury to complainant before such hearing could be had, the court ordered that the defendants be—

"Restrained and enjoined from entering upon the right of way and railroad grade, cuts, embankment, tunnels, or any other portions thereof, of that certain line of railroad right of way and railroad grade described in the bill of complaint herein, and being in Lincoln county, in said state and district of Nevada, beginning at a point on the eastern boundary line of said state, at or near a point now known as 'Uvada,' and extending thence southwesterly along the said grade and right of way indicated by said railroad bed, cuts, embankment, tunnels, etc., to a point called 'Clover Valley Junction,' a distance of about forty miles, and from said Clover Valley Junction, extending along such right of way, grade, embankment, cuts and fills, northerly or northwesterly, a distance of thirty miles, more or less, to a point at or near the town of Pioche, in said Lincoln county, and from in any manner obstructing, preventing, or interfering with the said complainant, its officers, agents, attorneys, servants, and employés, from proceeding peaceably and continuously with the work of construction of its railroad on and along

the said right of way, railroad grade, and embankment, until the further order of the court herein."

On June 3, 1901, complainant by leave of the court filed its amended and supplemental bill, praying for a restraining order enjoining the defendants from entering upon complainant's right of way from Clover Valley Junction, extending southwesterly, through Lincoln county and across the state of Nevada, to the western boundary of said state, upon the line of railroad right of way as indicated and shown upon certain maps of complainant, filed with and approved by the secretary of the interior. The court made an order requiring defendants to appear on the same day as they were required to appear or answer to the original bill to show cause why an injunction should not issue as prayed for in the supplemental bill. The rule to show cause was heard upon the averments of the original bill and answer of defendants filed thereto, the supplemental bill and demurrer thereto filed by defendants, divers maps of the respective parties, filed and approved, or held for information, by the secretary of the interior, various rulings of the general land office and decisions of the secretary of the interior, and numerous other documents, exhibits, and affidavits more or less relevant to the various questions involved herein, etc. The pleadings and proofs submitted on this hearing are so extremely lengthy as to render it difficult to make any brief statement, even in skeleton form, which will convey a true outline of the general facts presented by the respective parties. Certain matters, however, have been embodied in a statement of facts which will assist in the better understanding of some of the points discussed herein.

There are many links in the chain of evidence offered by the complainant in order to establish its right to the roadbed and right of way from Uvada to Clover Valley Junction, and from thence to Pioche, which would be important and material to be considered upon a final hearing herein, but which, in the light of all the facts, need not now be stated or discussed, as the title to said roadbed and right of way is not properly before the court at this time for determination. In fact, there are many questions involved herein, elaborately argued by counsel, which might, perhaps, be decisive of the real issues between the parties as to the title to the property in controversy, that are not, in my opinion, in a condition to be decided at the present time, which will be readily observed from a reading of the statement of facts, namely, the validity of the tax title acquired by the defendants to the roadbed situate in Lincoln county, and the validity of the surveyed right of way adopted by the complainant through the state of Nevada, and the character and effect of certain work done by the defendants, with reference to which the commissioner of the general land office has ordered a new hearing.

Independent of the question as to whether or not this court has any jurisdiction in the present suit to determine whether the judgment obtained by the state of Nevada against the Oregon Short Line & Utah Northern Railway Company for taxes is valid or invalid, it seems to me perfectly clear that the mere fact that this complainant selected the state court as the proper forum to determine that question is, of itself, sufficient for this court to refuse to discuss the

question or decide it in a collateral proceeding. The condition of affairs and the acts of the respective parties at the time the original bill was filed and the temporary restraining order issued were such as demanded immediate action in advance of the settlement, through the regular channels of litigation, of the principal controlling questions as to the title and legal rights of the respective parties. The situation, is, therefore, somewhat embarrassing and difficult. It is admitted that under the averments of the original bill the court was fully justified in issuing the restraining order. The questions presented are whether or not, under the pleadings and proofs upon the rule to show cause, the restraining order under the original bill should be continued or discharged, and whether, under the supplemental bill and proofs with reference thereto, a temporary injunction should be issued as prayed for therein. The whole case has been argued with signal ability, and all the points have been presented with as much earnestness, care, attention, and force as if the entire matter of a final hearing on the merits was involved.

2. It is earnestly contended by defendants' counsel that the Oregon Short Line & Utah Northern Railway Company had no title to the disputed right of way which it could convey either to the Oregon Short Line Railroad Company or the complainant, and that the purported deeds from the Oregon Short Line & Utah Northern Railway Company and the Oregon Short Line Railroad Company to the complainant, introduced in evidence in this case, conveyed nothing; that the Oregon Short Line & Utah Northern Railway Company forfeited whatever rights it ever had by surveys, location, and work done under the act of March 3, 1875, by failing to comply with the provisions of section 4 of said act and to complete any section of its road in five years; that the Oregon Short Line & Utah Northern Railway Company, prior to the organization of the Oregon Short Line Railroad Company and the complainant company, had forfeited any rights which its survey and location of its right of way may have given it over private lands under the laws of the state of Nevada. The proviso in section 4 of the act of congress of March 3, 1875, reads as follows:

"That if any section of said road shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any such uncompleted section of said road."

In 1865 the legislature of the state of Nevada passed "An act to provide for the incorporation of railroad companies, and the management of the affairs thereof, and other matters relating thereto," approved March 22, 1865. Comp. Laws Nev. (Cutting) § 971 et seq. Section 1024 reads as follows:

"If such railroad company shall not, within four years after the filing of its original articles of association, begin the construction of its road and expend thereon at least 5 per cent. of the amount of its capital stock, and finish the road and put it in full operation within six years, its act of incorporation shall be void."

It is argued by defendants that, because of the failure on behalf of this corporation to do the acts therein required within the time therein specified, its rights became ipso facto void; that by the terms

of the statute the forfeiture clause was self-operative, and became of full force by the lapse of the time mentioned; and that no steps or proceedings on the part of the sovereign power to make it complete or effective were at all essential. There are numerous cases where, upon the particular facts thereof, it has been held that, a statute creating a corporation which declares that unless the corporation performs certain acts within the prescribed time its corporate existence and powers shall cease, or its powers and franchises shall terminate, such statute executes itself. But the fact is that this question is always made dependent upon the special facts, the character of the corporation, and the legal construction to be given to the particular statute. The general rule is that the question whether a railroad corporation authorized by the state has forfeited its corporate rights and franchises cannot be raised in any collateral proceeding, and can only be taken advantage of by the sovereign power which created the corporation, because it is its privilege alone to question the right of the corporation to act under its franchise. The state may waive the conditions, or enforce them, if it sees fit to do so. When the continued life of the corporation is made by the charter or governing statute to depend upon the performance of a condition subsequent, the nonperformance of the condition is not an ipso facto forfeiture, but is a mere ground of forfeiture, of which the state can avail itself, or which it can waive at its pleasure. So that, unless the state takes advantage of the ground of forfeiture, in a proceeding by quo warranto, or otherwise, to oust the corporation of its franchise, the existence of the corporation cannot, upon such a ground, be collaterally called in question. The supreme court of the United States has uniformly held, in construing various acts of congress containing similar provisions to the act of 1875, that the failure to complete the road within the time limited is treated as a condition subsequent, not operating ipso facto as a revocation of the grant, but as authorizing the government itself to take advantage of it, and forfeit the grant by judicial proceeding, or by an act of congress resuming title to the lands. Schulenberg v. Harriman, 21 Wall. 44, 62, 22 L. Ed. 551; Van Wyck v. Knevals, 106 U. S. 360, 368, 1 Sup. Ct. 336, 27 L. Ed. 201; Railroad Co. v. McGee, 115 U. S. 469, 473, 6 Sup. Ct. 123, 29 L. Ed. 446, and authorities there cited; Bybee v. Railroad Co., 139 U. S. 663, 674, 11 Sup. Ct. 641, 35 L. Ed. 305, and authorities there cited; Railroad Co. v. Mingus, 165 U. S. 413, 431, 17 Sup. Ct. 348, 41 L. Ed. 770; U. S. v. Northern Pac. R. Co., 177 U. S. 435, 20 Sup. Ct. 706, 44 L. Ed. 836.

The distinction between the cases of In re Brooklyn, W. & N. Ry. Co., 72 N. Y. 245, and Brooklyn Steam Transit Co. v. City of Brooklyn, 78 N. Y. 524, and other cases relied upon by defendants, from the present case, is clearly pointed out in Bybee v. Railroad Co., supra, where the court said:

"Counsel for plaintiff has called our attention to several cases decided by the court of appeals of New York which doubtless have a bearing upon this question, but which, when carefully examined, are readily distinguishable. * * * In these cases the legislative act did not avoid the grant upon the nonperformance of the condition subsequent, but declared that the corporate existence and powers of the company to act were at an end. In other words,

it fixed a time for the expiration of the charter, and, when that time arrived, the corporation lost its power to act, or to do any business beyond such as was necessary in the process of winding up. It was not so much a case of forfeiture as of loss of legal entity, or, as expressed in the language of the court of appeals in the case in 78 N. Y.: 'In case of noncompliance, the act itself ceases to have any operation, and all the powers, rights, and franchises thereby granted were deemed forfeited and terminated. There was to be, not merely a case of forfeiture which could be enforced by an action instituted by the attorney general, but the powers, rights, and franchises were to be taken and treated as forfeited and terminated. At the end of the time limited the corporation was to come to an end, as if that were the time limited in its charter for its corporate existence.' More directly in point is the case of Oakland R. Co. v. Oakland, B. & F. V. R. Co., 45 Cal. 365, 13 Am. Rep. 181. In this case an act of the legislature granting a corporation the right of way to lay a street-railroad track provided 'that, if the provisions of this act are not complied with, then the franchise and privileges herein granted shall utterly cease and be forfeited.' A breach of this condition was held ipso facto to forfeit the franchises of the corporation. A distinction was drawn in this case between forfeitures at common law, which did not operate to devest the title of the owner until, by proper judgment in a suit instituted for that purpose, the rights of the state had been established, and a forfeiture declared by statute, in which case the title to the thing forfeited vests immediately in the state, upon the happening of the event for which the forfeiture is declared."

The supreme court then referred to the fact that the doctrine of these cases had not been universally accepted, and that under the facts there stated the principles therein announced have been distinctly repudiated in several states of the Union, and concluded with the statement that:

"It is not, indeed, always easy to determine whether a condition be precedent or subsequent. It must depend wholly upon the intention of the parties as expressed in the instrument and the facts surrounding its execution. If the condition does not necessarily precede the vesting of the estate, or if, from the nature of the act to be performed and the time required for its performance, it is evident that the intention of the parties is that the estate shall vest, and the grantee shall perform the act after taking possession, then the condition is treated as subsequent, and there is no forfeiture without a re-entry by the grantor, or, in the case of the state, without some action on its part manifesting an intention to resume its title. In the case under consideration, the act, as already stated, takes effect as a present grant, and the provision for a forfeiture in case the company fails to complete its road is clearly a condition subsequent."

3. It is next claimed by the defendants that no rights have been acquired by the complainant by virtue of any acts of its own, and in this connection it is argued that the evidence submitted on this hearing clearly shows that the defendant the San Pedro, Los Angeles & Salt Lake Railroad Company was the first to begin its surveys, and that it prosecuted the same diligently and properly to final completion by the filing of its maps and profiles thereof for approval by the secretary of the interior; that it was also the first to begin the actual work of constructing its line of railroad thereon; that it has purchased several miles of the right of way where the same extends across the lands of private parties on the line between Clover Valley Junction and Pioche, and also on the line from Clover Valley Junction southwesterly to the state line. On the other hand, it is claimed by the complainant that, independently of the rights accruing to it under the act of congress of March 3, 1875, and obtained by it from

the various auxiliary railroad corporations, it is first in time and first in right under the laws of Nevada, because it first legally adopted its definite line of location.    It must be borne in mind that, at the time the parties plaintiff and defendants entered upon the possession of the roadbed, neither corporation, plaintiff or defendant, had adopted any definite line or survey upon which its road was to be built. The facts are that complainant adopted its definite line of survey by a resolution duly passed by its board of directors on May 9, 1901, and the San Pedro, Los Angeles & Salt Lake Railroad Company adopted its definite line of route upon which it was to construct its railroad at a directors' meeting held May 22, 1901.    The rights of the respective parties, upon this branch of the case, do not depend upon the question of prior possession of either party upon any particular part of the roadbed or right of way, either for the purpose of making a survey or doing work thereon.    Neither party could gain any right by a possession obtained, or sought to be held, by force or violence. Whatever work was done was performed at their peril.    In my opinion it is wholly immaterial which corporation, through it officers, servants, or employés, first put foot upon the soil in dispute.    The legal machinery controlling any right to the roadbed or right of way obtained by the surveys, or by possession, could not be set in motion until the corporation claiming the right of way had by corporate acts definitely adopted the line upon which its road was to be built.    This is an essential act to be performed in order to enable the corporation to exercise the right of eminent domain under the statute.    Rochester, H. & L. R. Co. v. New York, L. E. & W. R. Co., 110 N. Y. 128, 17 N. E. 680; Southern Pac. R. Co. v. U. S., 109 Fed. 913; Railroad Co. v. Blair, 9 N. J. Eq. 635, 643, 645; Sioux City & D. M. R. Co. v. Chicago, M. & St. P. R. Co. (C. C.) 27 Fed. 770, 774; Johnston v. Callery, 184 Pa. 146, 151, 39 Atl. 73.

In Williamsport & N. B. R. Co. v. Philadelphia & E. R. Co., 141 Pa. 407, 414, 21 Atl. 645, 646, the court, in discussing this question, said:

"The successive steps contemplated by the act of 1849, and subsequent legislation, as necessary to vest a title to the roadway in the corporation, are these: (1) A preliminary entry on the lands of private owners for the purpose of exploration. This is made by engineers and surveyors, who run and mark one or more experimental lines, and who report their work, with such maps and profiles as may be necessary to present it properly to the company that employs them. (2) A selection and adoption of a line, or one of the lines, so run, as and for the location of the proposed railroad. This is done by the corporation, and it requires the action in some form of the board of directors. This makes what was before experimental and open, a fixed and definite location. It fastens a servitude upon the property affected thereby, and so takes from the owner and appropriates to the use of the corporation. (3) Payment to the owner for what is taken and the consequences of the taking, or security that it shall be made when the amount due him is legally ascertained. The title of the owner is not devested until the last of these steps has been taken. * * * As to third persons and rival corporations, however, the action of the company adopting a definite location is enough to give title. * * * In other words, this is the method by which the corporation exercises the power of eminent domain, with which the state invested it at its creation, and takes what before belonged to others for its corporate use. It may acquire land by purchase, if its charter authorizes it to do so, before a location of its road; but, if

it does so, it holds the land as any other purchaser would. subject to the right of any one having the right to do so to enter and appropriate it by virtue of the right of eminent domain. That a corporation cannot exercise the power to appropriate land until it has located its line is well settled. Thus, if a company has an option between two or more lines or routes, it must make its election by an actual adoption of one of them before it can acquire title by appropriation upon either. 1 Redf. R. R. 240. The reason for this is that the act of location is at the same time the act of appropriation."

In Railroad Co. v. Blair, supra, where many similar points were presented, the court, with reference to the necessity of adopting a definite line of location, among other things said:

"It may be true that the complainants first actually surveyed in the passes where the conflicts occur, although there seems to be some doubt on this subject. But, assuming it to be true, the mere experimental surveying of a route will not confer any vested or legal right, until it shall have been adopted. Until then the company is in no wise committed to it. If done by their direction, they may change their mind and go elsewhere. It may be the mere act of their engineer; and he may recommend it or not. If he should, the company may reject it, and select another route. Although the complainants, therefore, may have first surveyed the conflicting passes in the mountains, yet the Warren Company afterwards surveyed the same passes. and first adopted the route, and first filed their survey in the office of the secretary of state. This gave them a legal right to the route surveyed, and in my view excluded the complainants from occupying the same lands."

4. Has the complainant made out such a case upon this hearing as entitles it to a continuance of the restraining order heretofore issued? This is the vital point involved in the present hearing. It has frequently been held that the question whether the defendant should be enjoined from the commission of certain acts before the rights of the respective parties have been fully investigated and tried rests solely in the discretion of the court. 10 Enc. Pl. & Prac. 983, and authorities there cited. But in all cases essential facts must be clearly proven, in order to put the power of the court in motion and justify the issuance of the writ. As was said by the court in the early case of Bonaparte v. Camden & A. R. Co., 1 Baldw. 205, Fed. Cas. No. 1,617:

"There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction. It is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear; the injury impending or threatened, so as to be averted only by the protecting, preventive process of injunction."

The facts and circumstances of each particular case must always be considered, and the power of the court, whether in favor of or against the issuance of the writ, should always be exercised in furtherance of justice. It is "the strong arm of the court, and to render its operation benign and useful it must be exercised with great discretion and when necessity requires it." In the exercise of their discretion courts often take into consideration, even in grave and doubtful cases, the question as to whether the damage and injury committed or threatened by the defendant will be immediate, certain, and great if the injunction does not issue, and whether the loss and injury and

inconvenience to the defendant would be comparatively small and in-. significant if it does issue; and in the consideration of these questions the courts have frequently said that an injunction should issue to restrain interference with the property, although the ultimate relief sought might finally be denied. City of Newton v. Levis, 25 C. C. A. 161, 79 Fed. 715, 718, and authorities there cited; Indianapolis Gas Co. v. City of Indianapolis (C. C.) 82 Fed. 245; Allison v. Corson, 32 C. C. A. 12, 88 Fed. 581, 584, and authorities there cited; Charles v. City of Marion (C. C.) 98 Fed. 166. It is true, as counsel for defendants contend, that the writ of injunction will not ordinarily be granted, where the legal rights of the parties are in dispute, until the title and the legal rights to the property in controversy are established at law. But this rule is subject to many exceptions. The authorities are numerous where the courts, in a great variety of cases, in the exercise of the sound discretion with which they are invested, have interfered by injunction before the legal rights of the parties have been settled, and where the title to the real property remained undetermined.

In Erhardt v. Boaro, 113 U. S. 537, 5 Sup. Ct. 565, 28 L. Ed. 1116, it was held that if there was irremediable mischief, going to the destruction of the substance of the estate, done by parties in possession, the estate being in litigation at law, an injunction should be issued to prevent it. In that case the lower court had issued an injunction, but after a regular trial at law the defendant obtained judgment, and thereupon the court dissolved the injunction and dismissed the bill. From the decree in this regard an appeal was taken. In the course of the opinion the court said:

"It was formerly the doctrine of equity, in cases of alleged trespass on land, not to restrain the use and enjoyment of the premises by the defendant when the title was in dispute, but to leave the complaining party to his, remedy at law. A controversy as to the title was deemed sufficient to exclude the jurisdiction of the court. In Pillsworth v. Hopton, 6 Ves. 51, which was before Lord Eldon in 1801, he is reported to have said that he remembered being told in early life from the bench 'that if the plaintiff filed a bill for an account and an injunction to restrain waste, stating that the defendant claimed by a title adverse to his, he stated himself out of court as to the injunction.' This doctrine has been greatly modified in modern times, and it is now a common practice in cases where irremediable mischief is being done or threatened, going to the destruction of the substance of the estate, such as the extraction of ores from a mine, or the cutting down of timber, or the removal of coal, to issue an injunction, though the title to the premises be in litigation. The authority of the court is exercised in such cases, through its preventive writ, to preserve the property from destruction pending legal proceedings for the determination of the title. Jerome v. Ross, 7 Johns. Ch. 315, 332, 11 Am. Dec. 484; Le Roy v. Wright, 4 Sawy. 530, 535. Fed. Cas. No. 8,273. As the judgment in the action at law in favor of the defendant has been reversed, and a new trial ordered, the reason which originally existed for the injunction continues."

See Wilson v. Rockwell (C. C.) 29 Fed. 674; Northern Pac. R. Co. v. City of Spokane (C. C.) 52 Fed. 428; St. Louis Min. & Mill. Co. v. Montana Min. Co. (C. C.) 58 Fed. 129; Buskirk v. King, 18 C. C. A. 418, 72 Fed. 22, 25, and authorities there cited.

In Rochester, H. & L. R. Co. v. New York, L. E. & W. R. Co., 110 N. Y. 128, 133, 17 N. E. 680, 681, the judge at special term vacated

the injunction, theretofore granted, restraining the defendant corporation from interfering with the plaintiff's roadbed, on the ground that the plaintiff had not acquired title to the land nor any right to occupy it.   He stated that the proceeding of defendant was "outrageous," but considered that he had no right to interfere.   The general term, in their opinion, considered that a case had been made for the allowance of a preliminary injunction, and that the same should be continued pendente lite, on the ground that the plaintiff had acquired a vested and exclusive right to construct and operate its railroad on the line it had located.   The court of appeals came to the conclusion that the general term were right in the view they took of the matter. The court, after referring to the provisions of the general railroad act of that state for the organization of railroads, said:

"Clearly there is involved in these provisions the intention of the legislature that, after the initial proceedings have been taken, which the statute points out as the first action of the new corporation, the lands over which the company's route is located shall be subjected to the right of the company thereafter to construct thereon.   The legislative scheme contemplates the determination of the line of route to be in the discretion of the company, to be exercised in the mode prescribed by law; and its exercise, when in good faith and within the limits of its corporate powers, is only reviewable by the court in the case of an application by an occupant or owner of lands feeling aggrieved by the proposed location of the road.   This right to locate its line of road, at its election, is delegated to the corporation by the sovereign power, as is the right subsequent to acquire, in invitum, the right of way from the landowner and any land needed for the operation of its road. In this sovereign power is the source of the franchise, which the corporation possesses, to construct and operate a railroad; and its grant is for public, and not for private, purposes.   Public considerations enter into the grant of the franchise, and public policy favors the enterprise for the public convenience and use.   When, therefore, a corporation has made and filed a map and survey of the line of route it intends to adopt for the construction of its road,   *   *   *   in our judgment, it has acquired the right to construct and operate a railroad upon such line, exclusive in that respect as to all other railroad corporations and free from the interference of any party.   By its proceedings it has impressed upon the lands a lien in favor of its right to construct, which ripens into title through purchase or condemnation proceedings.   We could not hold otherwise without introducing confusion in the execution of such corporate projects, and without violating the obvious intention of the legislature.   The plaintiff's franchises were invaded, and its enjoyment of the statutory privileges disturbed, by the action of the defendant company in so building tracks upon plaintiff's line of route as to obstruct and interfere with its proposed construction.   The remedy by injunction was clearly available to the plaintiff on principles of equity jurisprudence."

On the question of injunction, this court, in the consideration of the line of survey from Clover Valley Junction to the southwestern end of the state line, as set forth in the supplemental bill, is hampered in the expression of its opinion upon the acts of the respective parties because no intelligent discussion could be had in regard thereto without reviewing the manner in which the surveys on behalf of the complainant were made, and the character of the work done on the surveyed line by the defendants thereon, and upon both of these points the land department of the government, having jurisdiction of these questions, has demanded a further hearing.   Under these conditions I deem it to be my duty to respectfully decline to express my individual views in regard thereto.   It is enough, for the purposes of

this opinion, to say that as to this portion of the line of survey the facts, as presented to this court, stand upon a different plane in some respects from the question relating to the line of survey over the roadbed from Uvada, via Clover Valley Junction, to a point near Pioche. My conclusion upon the whole case is that the complainant has made out such a prima facie case as to entitle it to an injunction pendente lite as to that part of the right of way covered by the roadbed from Uvada to Clover Valley Junction, and from thence to Pioche, and that it has not made out such a case as to entitle it to the additional injunction as prayed for in the supplemental bill. Let a decree be entered accordingly.