CALIFORNIA REDUCTION CO. et al. v. SANITARY REDUCTION WORKS
OF SAN FRANCISCO.

(Circuit Court of Appeals, Ninth Circuit.   October 3, 1903.)

No. 901.

**1. CONSTITUTIONAL LAW—LIMITATIONS OF POLICE POWER—REVIEW OF REGULATIONS BY COURT.**

The police power of a state is not absolute, and its exercise is subject to review by the courts.   Neither the Legislature nor a municipality can, under the guise of police regulation, arbitrarily invade personal or property rights; and when such regulations are called in question the test should be whether they have some relation to the public health or public safety, and whether such is in fact the end sought to be attained.   If not, they should be declared invalid, as exceeding the legislative power; but, if within such power, the courts have nothing to do with the wisdom, policy, or expediency of the law, the power to make it necessarily carrying with it the power to judge of its necessity, expediency, and justice, and primarily, at least, of the reasonableness of the means used to accomplish the end sought.

**2. SAME—INTERFERENCE WITH PRIVATE RIGHTS.**

Laws or ordinances enacted under the police power for the protection of the public health, reasonably adapted to that end, are not unconstitutional because they may incidentally operate to deprive individuals of their property or its use without compensation, or interfere with their personal liberty, nor because they may give one person a monopoly of a certain business or occupation, private rights being required to yield in such case to the public good.

**3. MUNICIPAL CORPORATIONS—CONTRACTS MADE UNDER POLICE POWER—DISPO-SITION OF GARBAGE.**

Const. Cal. art. 11, § 11, provides that municipal corporations may "make and enforce all such local, police, sanitary and other regulations as are not in conflict with general laws." The consolidation act of April 25, 1863 (St. 1863, p. 540, c. 352), empowered the board of supervisors of the city and county of San Francisco "by regulation or order * * * to authorize and direct the summary abatement of nuisances; to make all regulations which may be necessary or expedient for the preservation of the public health, and the prevention of contagious diseases; to provide by regulation for the prevention and summary removal of all nuisances," etc. *Held* that, having power, under such provisions, to itself regulate the removal and disposition of all garbage and refuse matter, the municipality had power to contract with others for such removal or disposition, and that an order granting an exclusive franchise or privilege to a person or his assigns to receive and destroy all garbage and refuse collected in the city for a term of 50 years, conditioned on his erecting and maintaining a crematory and burning all such garbage within 24 hours after the receipt and paying to the city a percentage of the gross receipts from the business was within the authority granted, as well as within the police power of the state.

**4. SAME—MODE OF CONTRACTING—CITY AND COUNTY OF SAN FRANCISCO.**

Under the consolidation act of April 25, 1863 (St. 1863, p. 540, c. 352), which authorizes the board of supervisors of the city and county of San Francisco to proceed under the police power by "regulation or order," a contract for disposition of garbage may be made by an order, and the mayor's signature is not essential to its validity.

**5. SAME—VALIDITY OF GRANT—COLLATERAL ATTACK.**

The validity of a grant of a privilege or franchise by a municipal corporation, which amounts to a contract, and under which the grantee is acting, cannot be collaterally attacked by a private party in a suit in equity on the ground of irregularity in the exercise of its power by the municipality, nor because of the alleged failure of the grantee to perform the conditions imposed, the nonperformance of which it was provided should work a forfeiture, such matters being determinable only at suit of the granting authority.

**6. SAME—CONSTRUCTION OF CONTRACT.**

An order of the board of supervisors of the city and county of San Francisco granted to complainant's assignor "the sole and exclusive right and privilege" to cremate and destroy "within the city and county" all garbage or refuse for the term of 50 years, and to charge and collect the amount specified therefor at the crematory, a percentage of which was to be paid to the municipality in payment for the franchise. *Held,* that such order must be construed in accordance with the evident meaning of the parties as giving to complainant the right to receive for reduction at the plant built for the purpose all garbage collected in the city, and that complainant was entitled to an injunction to restrain the infringement of such exclusive right by defendants by collecting garbage and removing the same outside the city and county for disposition.

Appeal from the Circuit Court of the United States for the Northern District of California.

See 94 Fed. 693.

Page, McCutchen, Knight & Harding, Garret W. McEnerney, and Black & Leaming, for appellants.

William M. Pierson and C. L. Tilden, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This is a suit in equity, brought by the Sanitary Reduction Works of San Francisco to obtain an in-

junction to prevent the California Reduction Company et al. from removing any of the substances or materials named in the complaint, and to restrain them from infringing upon the exclusive rights and privileges of appellee, under certain orders, in the cremation of deleterious matters. The Sanitary Reduction Works is a California corporation engaged in the business of incinerating house refuse and garbage at San Francisco in a large crematory owned and operated by it. The California Reduction Company is a Colorado corporation, organized for the purpose of removing from the city and county of San Francisco by boats and barges house refuse and garbage for destruction and disposition outside the city and county of San Francisco. The other defendants, about 140 in number, are subjects of the King of Italy, and pursue the occupation of scavengers in San Francisco, and about half a dozen of them are shown to be householders in the city of San Francisco.

A preliminary injunction, in accordance with the prayer of the bill of complaint, was issued by the court May 25, 1899. The Sanitary Reduction Works of San Francisco v. The California Reduction Company et al. (C. C.) 94 Fed. 693. The cause came up for final hearing, and resulted in a decree perpetually enjoining and restraining the respondents (appellants herein), and all of them, "from directly or indirectly removing from the city and county of San Francisco, state of California, any house refuse, butchers' offal, garbage, refuse, dirt, ashes, sludge, crockery, tins, cinders, bones, and other like matter, dead animals, putrid vegetable matter, or such fish, flesh, or food as may be condemned by the board of health of said city and county as unfit for human food, as specified in Order No. 2,965 or in Order No. 12 (Second Series) of the board of supervisors of the said city and county of San Francisco, state of California, set forth in the bill of complaint herein, and from depositing or dumping at any other place in said city and county of San Francisco, save and except at the works, buildings, and crematories of the complainant herein in said city and county of San Francisco, any of the house refuse or other materials hereinbefore described, during the life and term of the contract and franchise belonging to the complainant as alleged in the bill of complaint herein, and from obstructing, hindering, or in any way interfering with said complainant in the delivery of it, or in the incineration and cremation by it of any of the house refuse or other materials mentioned and described in said orders and ordinances and in the bill of complaint herein, and from diverting from the complainant any of said house refuse or other materials, and from infringing in any manner upon the rights, privileges, or franchises secured to said complainant by the aforesaid orders or ordinances, and from interfering with said complainant in the performance of any of its duties under said orders or ordinances." From this decree the appeal herein is taken.

The Constitution of California (article 11, § 11) provides that:

"Any county, city, town, or township may make and enforce, within its limits, all such local, police, sanitary and other regulations as are not in conflict with general laws."

The Legislature of the state, by an act approved April 25, 1863, provided, among other things, that:

"The board of supervisors of the city and county of San Francisco, shall have power, by regulation or order, * * * 2d. To authorize and direct the summary abatement of nuisances; to make all regulations which may be necessary or expedient for the preservation of the public health and the prevention of contagious diseases; to provide by regulation for the prevention and summary removal of all nuisances and obstructions in the streets, alleys, highways and public grounds of said city and county, and to prevent or regulate the running at large of dogs, and to authorize the destruction of the same when at large contrary to ordinance." St. 1863, p. 540, c. 352.

On March 23, 1893, the Legislature passed "An act providing for the sale of railroad and other franchises in municipalities, and relative to granting of franchises," by which it was provided, among other things, that "every franchise or privilege to erect or lay telegraph or telephone wires, to construct or operate railroads along or upon any public street or highway, or to exercise any other privilege whatever hereafter proposed to be granted by the board of supervisors," etc., should be granted upon the conditions in that act provided, and not otherwise. The act' also provided for an advertisement of the fact that an application for such franchise or privilege has been made, asking for bids for the same, and providing for the award of the franchise or privilege to the highest bidder. St. 1893, p. 288, c. 204. On February 17, 1896, the board of supervisors sold to F. E. Sharon, his associates and assigns, under the provisions of the act of the Legislature just referred to, in consideration of $2,510, and the further payment of 2 per cent. for the term of 15 years and of 5 per cent. for the remaining term of 35 years of the gross amount of the receipts to be derived by said Sharon, his associates or assigns, the franchise and privilege to cremate garbage, house refuse, dead animals and putrid vegetable matter and material of a like character, in which franchise it was provided that the sole and exclusive right and privilege was thereby conferred upon and granted to F. E. Sharon, his associates and assigns, for the .term of 50 years to cremate and destroy within the city and county aforesaid by crematories or by a process of reduction, house refuse, etc., as mentioned in the decree, and prohibiting .the removal through the public streets, after the passage of the order, from any houses, hotels, markets, etc., any such matter unless conveyed in closed vehicles constructed so as to conceal the contents from public view, and to prevent any smell escaping therefrom, and to prevent the dropping of any such material or substance on the public streets; and further prohibiting any person or corporation from dumping or placing upon any land within said city and county or in any water or waterways within said city and county any of the matter aforesaid, except at the crematory of the grantee of the franchise; and, further, that all such matter and substances should be cremated by the grantee of the franchise within 24 hours after its receipt of the same. The appellee, as the grantee of F. E. Sharon, under the provisions of Order No. 2,965, completed the construction of a large brick crematory, and fitted it for the purpose of cremating and destroying by fire all of the materials mentioned in that order, at a cost of about $180,000. It notified the board of

supervisors of the completion of its plant, and of its readiness to receive, cremate, and destroy the substances mentioned in Order No. 2,965. The board of supervisors passed an order known as "Order No. 12 (Second Series)," which, after reciting several facts which led up to the passage of Order No. 2,965, passed February 17, 1896, provided that no person, company, or corporation should, after the 8th of November, 1897, deposit, dump, or cause to be dumped or deposited upon any lot or land within the city and county, excepting at the crematory of the Sanitary Reduction Works, any of the garbage, refuse matter, etc., referred to in said order, and further provided a fine and imprisonment for any violation of the provisions of the order.

The contention of appellants is, in substance, to the effect that the appellee's exclusive privilege of incinerating house refuse and garbage in San Francisco is invalid. (1) That the right or privilege claimed by the complainant could only be granted, if at all, under the police power of the municipality; (2) that Order No. 2,965 was never signed by the mayor of the city and county of San Francisco, and was therefore never lawfully enacted; (3) that the act of March 23, 1893 (St. Cal. 1893, p. 288, c. 204), has no application to this case for the reason that the right and privilege claimed is in no sense a franchise; (4) that, if the right and privilege claimed by the complainant be a franchise, there is no authority of law for the granting of such a franchise by the city and county of San Francisco; (5) that the act of March 23, 1893, confers no authority to grant franchises, that it was intended to limit the power to grant franchises which had been given by laws previously passed; (6) that there is no authority of law for the granting of an exclusive franchise; (7) that there is no authority of law for the imposition of the compulsory payment of 20 cents a cubic yard upon the householders of the city and county of San Francisco; (8) that the grant was invalid under article 1, § 21, of the Constitution of California, which provides that no citizen or class of citizens shall "be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens"; (9) that, if the privilege claimed by appellants is authorized by the act of March 23, 1893, the grant thereof is void for the reason that it never received the approval of the mayor, as required by section 68 of the so-called "Consolidation Act" (St. 1856, p. 163, c. 125), the old charter of the city and county of San Francisco; (10) that, if the privilege claimed by appellee is authorized by the act of March 23, 1893, the grant thereof is void for the reason that the privilege was not sold to the highest bidder, as required by the act of March 23, 1893; (11) that the privilege claimed by the complainant is invalid because the board of supervisors was without power to grant it for the unreasonable period of 50 years; (12) that the grant of the privilege claimed is unreasonable and invalid because it interferes with the exercise of the legitimate calling of transporting house refuse and garbage; (13) that it is invalid because it deprives the owner thereof of property of commercial value without any necessity and without compensation; (14) that it is unreasonable and invalid because it is an invasion of a right common to all to engage in a legitimate busi-

126 F.—3

ness of burning garbage; (15) that it is unreasonable and invalid because there is no necessity to prevent the removal of house refuse and garbage from the municipality for destruction or disposition elsewhere; (16) that it is unreasonable because it prohibits the performance of a harmless act in a proper and harmless manner; (17) that it does not prohibit the transportation of house refuse and garbage beyond the territorial limits of the municipality; (18) that the right claimed has been forfeited by reason of overcharging by the complainant for the destruction of the substances enumerated; (19) that the right claimed has been forfeited because in the enjoyment thereof the appellee is maintaining a nuisance; (20) that, if the grant of the privilege claimed by the complainant is a franchise, the respondents are entitled to defend on the ground that there has been no grant of such a franchise, or that the franchise has been forfeited, and no longer exists.

It must be admitted that the power of the Legislature or municipality under what is commonly designated as the "police power of the state," is not absolute. It does not necessarily follow that every statute which may be enacted by the Legislature, or order passed by a municipality, ostensibly for the purpose of preserving the public health, protecting the public morals, and guarding the public safety, is always to be accepted as a legitimate exercise of the police power of a state. Neither the Legislature nor municipality can, under the guise of police regulations, arbitrarily invade private property or personal rights; and when such regulations are called in question the test should be whether they have some relation to the public health or public safety, and whether such is, in fact, the end sought to be attained. The means used must be such as are reasonably necessary for the accomplishment of the purpose, and must not be unduly oppressive upon individuals or the public. Every act, order, or ordinance is subject to review by the courts, and, if the power granted by the Constitution is exceeded by the Legislature or municipality, it is the duty of the courts to declare such act, order, or ordinance invalid. Under the guise of protecting the public interests, neither the Legislature nor the municipality can arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful business and occupations. The police power cannot be used as a shield for all the ills that legislation is heir to, but it must be recognized that the power and purposes of laws of this character are necessarily very broad and far-reaching, and, if the power granted does not exceed the limits of the Constitution, and clearly comes within the legitimate exercise of the police power, it should be sustained. It may be that it is impractical, if not impossible, to definitely prescribe the limits of the police power by any general rule or definition. As was said by Chief Justice Shaw in Commonwealth v. Alger, 7 Cush. 84: "It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries or prescribe limits to its exercise." 18 Am. & Eng. Ency. L. (2d Ed.) 915, and authorities there cited. One thing, however, is certain: that everything which, from its nature and surroundings, is, or is liable to become, a menace to the public health or public

safety, is a proper subject to be dealt with under the police power of a state. This case comes within that class. The power to make the law necessarily carries with it the power to judge of its necessity, expediency, and justice, and, primarily at least, of the reasonableness of the means and methods used to accomplish the end sought to be obtained. Courts have nothing to do with the wisdom, policy, or expediency of the law. The courts are only authorized to deal with the question of the power of the Legislature or municipality to pass the laws or orders in question, and determine whether they are valid, and, if so, to construe their provisions. There their duty ends. These general principles are axiomatic in the jurisprudence of this country. Mugler v. Kansas, 123 U. S. 623, 661, 8 Sup. Ct. 273, 31 L. Ed. 205; Powell v. Pennsylvania, 127 U. S. 678, 685, 8 Sup. Ct. 992, 32 L. Ed. 253; Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346; Lawton v. Steele, 152 U. S. 133, 136, 14 Sup. Ct. 499, 38 L. Ed. 385; In re Wilshire (C. C.) 103 Fed. 620, 622, and authorities there cited; Jew Ho v. Williamson (C. C.) 103 Fed. 10, 17, 20; Iler v. Ross (Neb.) 90 N. W. 869, 57 L. R. A. 895.

Appellee, in support of the constitutionality of its contract with the city and the validity of the orders of the municipality upon which it is based, relies upon the principles announced in Alpers v. City and County of San Francisco (C. C.) 32 Fed. 503; National Fertilizer Co. v. Lambert (C. C.) 48 Fed. 458, and in the Slaughter-House Cases, 16 Wall. 36, 64, 21 L. Ed. 394. In the Alpers Case, Mr. Justice Field, in upholding the constitutionality of the "dead animal contract," said:

"There is no doubt that the contract between the plaintiff and the city and county of San Francisco is one within the competency of the municipality to make. It is within the power of all such bodies to provide for the health of their inhabitants by causing the removal from their limits of all dead animals not slain for human food, which otherwise would soon decay, and, by corrupting the air, engender disease. And provisions for such removal may be made by contract, as well as the performance of any other duty touching the health and comfort of the city; its authorities always preserving such control over the matter as to secure an observance of proper sanitary regulations."

And, in addition to this general power, he referred to article 11, § 11 of the Constitution and to the provisions of the consolidation act of 1863.

In the Lambert Case, the court, in answer to the objections made that the contract attempted to create a monopoly, that it was in violation of section 21, art. 1, of the Constitution of California, and that it deprived persons of their property without due process of law, said:

"It is the duty of every government, whether state or municipal, to pass laws or ordinances for preserving the public health, protecting the good order and peace of society, and providing for the abatement of nuisances. Such laws, if they contain nothing more than the necessary restrictions and limitations for the accomplishment of such purposes, are not unconstitutional on the ground that they deprive persons of their property without due process of law. Quarantine regulations, for instance, materially interfere with the free and unobstructed use of private property, and for the time being restrain, to a certain extent, the liberty of individuals. Yet the health, safety, and welfare of the community often demand their enforcement; and such laws have always been upheld as necessary police regulations. Several other instances might be cited where laws of a similar character are sustained, but

the authorities are too numerous, and the general principles of law too well settled, to require any extended reference or review. No person has an inalienable right to produce disease, or trade in that which is noxious; and in every community, large or small, some minor rights of individuals must be surrendered for the benefit, protection, health, and general good of all."

These decisions may not be absolutely decisive of all the questions relied upon by appellants, but the principles therein announced are certainly conclusive upon many of the points involved in this case. The authorities, if any are needed, to support these views are abundant. We cite, in addition to those already referred to, a few of the later cases on the subject: Walker v. Jameson, 140 Ind. 591, 37 N. E. 402, 39 N. E. 869, 28 L. R. A. 679, 683, 49 Am. St. Rep. 222; Smiley v. MacDonald, 42 Neb. 5, 13, 60 N. W. 355, 27 L. R. A. 540, 47 Am. St. Rep. 684; Harrington v. City of Providence (R. I.) 38 Atl. 1, 38 L. R. A. 305; Ex parte Tuttle, 91 Cal. 589, 591, 27 Pac. 933; Ex parte Lacey, 108 Cal. 326, 41 Pac. 411, 38 L. R. A. 640, 49 Am. St. Rep. 93; City of Louisville v. Wible, 84 Ky. 290, 294, 1 S. W. 605; State v. Orr, 68 Conn. 101, 110, 35 Atl. 770, 34 L. R. A. 279; City of Grand Rapids v. De Vries, 123 Mich. 570, 580, 583, 82 N. W. 269; Kilvington v. City of Superior, 83 Wis. 222, 226, 53 N. W. 487, 18 L. R. A. 45; 18 Am. & Eng. Ency. L. (2d Ed.) 922, 940, and authorities there cited. In Walker v. Jameson, supra, the court had under consideration the validity of a contract made by the board of public works of the city of Indianapolis, clothing one Woodward with the exclusive right, privilege, and obligation to remove the garbage, etc., from the premises of all persons in the city, and to transport the same to a crematory. This contract was let to the lowest bidder, and afterwards assigned to Jameson, who brought suit to enjoin appellants from interfering with or removing such garbage, etc. Appellant there, as here, contended that the contract was invalid because the board of public works had no authority to make it. The court discussed all the points made by counsel, and in the course of the opinion declared that it was within the general power of the government to preserve and promote the public welfare even at the expense of private rights; that under the police power of the state persons and property may be subjected to all kinds of restraints and diligence in order to secure the general comfort, health, and prosperity of the state, and that it is the inherent and plenary power of the state which enables it to prohibit all things hurtful to the comfort and welfare of society; that it resolves itself solely into a question of power, and not of mere reasonableness; that a municipal corporation has no power to treat a thing as a nuisance which cannot be one, but it has the power to treat as a nuisance a thing that, from its character, location, and surroundings, may or does become such; that in doubtful cases, where a thing may or may not be a nuisance, depending upon a variety of circumstances requiring judgment and discretion on the part of the town authorities in exercising their legislative functions under a general delegation of power, their action, under such circumstances, would be conclusive of the question; that it has been often held to be reasonable for municipalities to grant to one or more the exclusive right to remove the carcasses of dead animals and other offal of the city; and in summing up said:

"In view of the great weight of authorities, we are of the opinion that the contract and ordinance assailed are both within the long-settled and clearly recognized lines of police power, which is as broad as the power of taxation, and, being simply a sanitary regulation, they cannot be considered as in the nature of confiscation, or an attempt to create a monopoly. The provision for the removal of the garbage at the expense of the property holder is an extreme exercise of this power, but is an incident to its existence. It is a familiar rule that, if the power is conferred upon a municipal corporation by the laws of the state, and the law is silent as to the mode of doing such act, the corporate authorities are necessarily clothed with a reasonable discretion to determine the manner in which such act shall be done. All the reasonable methods of executing such power are inferred. * * * The right of removal by contract or otherwise being vested in the city, it was for the common council to determine whether the work should be paid for out of the city treasury or by the person producing the garbage, and their action is not subject to review here. It may be that the hotel and restaurant keepers will lose money on their garbage under the workings of this contract, where they before derived a revenue; but if, under this plan, the sources of contagion and disease will be more speedily and effectively removed, the city was empowered to make this contract."

The opinion of Mr. Justice Miller, speaking for a majority of the court in the Slaughter-House Cases, contains perhaps a clearer and stronger expression of opinion in relation to the subject under consideration than any of the other cases we have referred to. Its full force and effect, as applicable to the case in hand, is materially strengthened by reference to the language used by Mr. Justice Bradley and Mr. Justice Field (who dissented from the majority) in their concurring opinion in Bartemeyer v. Iowa, 18 Wall. 129, 136, 138, 21 L. Ed. 929. Mr. Justice Field said:

"No one has ever pretended, that I am aware of, that the fourteenth amendment interferes in any respect with the police power of the state. Certainly no one who desires to give to that amendment its legitimate operation has ever asserted for it any such effect. It was not adopted for any such purpose. The judges who dissented from the opinion of the majority of the court in the Slaughter-House Cases never contended for any such position. But, on the contrary, they recognized the power of the state in its fullest extent, observing that it embraced all regulations affecting the health, good order, morals, peace, and safety of society; that all sorts of restrictions and burdens were imposed under it; and that, when these were not in conflict with any constitutional prohibition or fundamental principles, they could not be successfully assailed in a judicial tribunal."

The municipality of San Francisco had authority, under the provisions of section 1 of the act of 1863, "by regulation or order * * * to authorize and direct the summary abatement of nuisances; to make all regulations which may be necessary or expedient for the preservation of the public health, and the prevention of contagious diseases; to provide by regulation for the prevention and summary removal of all nuisances," etc. St. 1863, p. 540, c. 352. And by the Constitution of the state (article 11, § 11) it has the power to "make and enforce all such local, police, sanitary and other regulations as are not in conflict with general laws." It had the power, as was held in the Slaughter-House Cases, and in many of the other cases which we have cited, itself to regulate the removal and disposition of all garbage and refuse matter; and, having this authority, it naturally follows that it had the power to contract with others to perform that duty.

The general principles we have announced, and several of the authorities we have cited, furnish an answer to appellants' contention that the board of supervisors had no authority to confer an exclusive privilege or franchise. This question was involved in the Alpers and Lambert Cases, where a similar contract was upheld. See, also, Slaughter-House Cases, supra; Louisville Gas Co. v. Citizens' Gas Co., 115 U. S. 683, 691, 6 Sup. Ct. 265, 29 L. Ed. 510.

In Smiley v. MacDonald, supra, it was claimed that the grant—which was practically the same as in the present case—was in violation of the Constitution of Nebraska, which prohibits the grant to any corporation or individual of "any special or exclusive privileges or immunity or franchise whatever." The court, in the course of its opinion, said:

"The removal of the noxious and unwholesome matter mentioned in the contract tends directly to promote the public health, comfort, and welfare, and is therefore a proper exercise of the police power. Nor is the fact that in this instance the city has by contract conferred an exclusive privilege material. From the power thus conferred upon the city is implied the duty to determine the means and agencies best adapted to the end in view. The means adopted appear to be not only a reasonable and necessary regulation, but a judicious exercise of the discretion conferred upon the city. That the object of all such regulations can be best attained by intrusting the work in hand to a responsible contractor who possesses the facilities for carrying it on with dispatch and with the least possible inconvenience to the public is apparent to all. * * * The alleged excess of power is a mere sanitary measure, as obviously so as the familiar and necessary quarantine for the detention of persons exposed to contagious diseases. In either case the privilege, although exclusive, is but an incident to the proper exercise of the general police power of the state."

The question as to the reasonableness of granting the exclusive franchise for 50 years is one upon which there may be honest differences of opinion. Courts cannot, in the determination of this question, run a race of opinion upon points of reason and expediency with the law-making power. No iron-clad rule can be laid down to determine where the discretion of the board ceases and where the power and authority of the court to declare the action of the board unreasonable begins. The border line must be ascertained by the facts, conditions, and circumstances surrounding the subject-matter in every particular case. The board in the present case exercised its best judgment in passing Order No. 2,965, and included therein such terms and conditions as it deemed necessary for the protection of the public health, safety, and welfare. It was authorized by the laws of the state to make the contract in question. It was required to act with sound discretion as to the methods and terms. With the honest and reasonable exercise of this authority a court has no right to interfere, although the board may not have chosen the best method or made the most advantageous contract in relation to the subject-matter. It is only in cases where it clearly appears that the board has exceeded its authority, or acted arbitrarily, oppressively, and unjustly in the exercise of its discretion, that a court is called upon to act. When we take into consideration, as we must, the large expense to be incurred by appellee in the building of its crematory, and the protection and benefit to be derived by the city and its inhabitants,

we are unwilling to say that the term of 50 years for the life of the contract is so unreasonable as to authorize, warrant, or justify us, in the light of all the authorities and of all the facts, to declare the order void.

It is argued that the privilege claimed by appellee is unreasonable and invalid, because it interferes with the legitimate calling and occupation of the scavengers, appellants herein.   It is true that all persons engaged in lawful occupations, whether rich or poor, whether of high or low degree, are entitled to certain inalienable rights of life, liberty, and property.   The scavengers of a city are equally entitled with other citizens engaged in other lawful occupations to the equal protection of the law.   The right to follow any of the ordinary callings of life is a privilege which belongs to all, but these inalienable rights and privileges are always subject to the rights of the state or municipality to exercise its police power.   The orders of the municipality do not deny to the scavengers the right to exercise their lawful trade or calling, or impose any burdens upon them which are beyond the power of the municipality to make.   The privileges granted do not destroy the business of the scavengers as a class.   All men who are engaged in lawful occupations in the enjoyment of their rights are liable to be subjected to many restraints.   They must all use their property and conduct their business so as not to injure the rights of others.   They must obey the laws of the country in which they live.   Private interests must often be made subservient to the general interest of the community at large.   The life and health of the citizens in a populated community depend to a great extent upon the sanitary regulations imposed under a proper exercise of the police power, which extends to the protection of the life, health, and comfort of the citizens; and it is elementary that persons and property may be subjected to all kinds of restraints and burdens in order to secure and protect public health and public safety.

In Lawton v. Steele, supra, the court said:

"The extent and limits of what is known as the police power have been a fruitful subject of discussion in the appellate courts of nearly every state in the Union.   It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement by summary proceedings of whatever may be regarded as a public nuisance."

And, after citing may occupations and businesses and circumstances under which this power may be lawfully exercised, adds:

"Beyond this, however, the state may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests."

Appellants cite In re Lowe, 54 Kan. 757, 39 Pac. 710, 27 L. R. A. 545, among others, in support of their position.   An examination of the authorities proves the correctness of the statement made in the notes to Smiley v. MacDonald, 27 L. R. A. 540, that the case of In re Lowe "seems to stand alone in so far as it holds that the regulations for the removal of garbage and filth from a city must leave a way open to every person who will comply with the ordinance to engage at least in so much of the business of scavengers as relates

to entering on private property and removing filth and garbage therefrom."

Iler v. Ross, supra, was an extreme case, where the principles announced in the Lowe Case were applied; but the court said that the application as made to the facts of that case "is not supported by the weight of authority."

As a matter of fact, the scavengers in this case are not enjoined from "entering on private property and removing filth and garbage therefrom." The object sought to be accomplished in this suit is to enjoin appellants from diverting from the crematory of appellee in the city and county of San Francisco the garbage, waste, and refuse within the city, which the scavengers collect in the prosecution of their business. This does not deprive them of the right to collect the garbage, but does prevent them from interfering with the right given by the city to dispose of it in any other way than by dumping or delivering it at appellee's crematory.

Certain questions have been ably argued by the respective counsel, which, in the light of the views we have already expressed and entertain concerning this case, may be briefly disposed of. Appellants earnestly contend that, if the contract should be held valid under the police power of the state, yet the right and privilege claimed by appellee is in no sense a franchise; that the question whether the right and privilege granted by the municipality is a franchise "is one of the most important questions in the case," because, without such a determination, it is impossible to decide many of the other questions involved herein. It was held by the trial court, in granting the preliminary injunction, that the contract in question was a franchise, and as such could be maintained under the provisions of the act approved March 23, 1893 (St. 1893, p. 288, c. 204), heretofore referred to. The conclusions reached by the court upon this subject are supported by the decision of the Supreme Court of California in People v. Board of Supervisors, 122 Cal. 421, 55 Pac. 131, and, inasmuch as we have arrived at the conclusion that the rights and privileges conferred by the board were constitutional and valid in the proper exercise of the police power of the state, and could be sustained as a contract, it seems to us unnecessary to further discuss the question whether it could also be upheld and maintained as a franchise. The term "franchise" has several significations, and there is some confusion in its use. We might concede, for the purposes of this opinion, that the rights and privileges conferred upon appellee are not, in the strict sense of the term, a franchise, yet it must certainly be admitted that they are special rights and privileges in the nature of a franchise, which create a valid contract which the courts should sustain.

Order No. 2,965 is claimed to be invalid because it was not signed by the mayor, as required by the act of 1893, and in this connection it is claimed that the words found in the statutes of California, "by regulation or order," are synonymous with the words elsewhere used, "ordinance and resolution." Admitting that these words may often be used to express the same meaning, it does not necessarily follow that in all cases the word "order" is synonymous with "ordi-

nance," or that the word "resolution" is synonymous with "regulation." It is enough to say that by section 1 of the act of 1863 the municipality was authorized to proceed under the police power "by order and regulation" to do the things mentioned in Order No. 2,965 and Order No. 12 (Second Series)."

In People v. Counts, 89 Cal. 15, 22, 26 Pac. 612, it was claimed that the board should have proceeded by ordinance, and not by order. The court said:

"Conceding that the county government act for some purposes requires an ordinance, whilst for other purposes only an order is required, it is only necessary, in answer to this objection, to say that for the purpose under consideration section 37 of the act [St. 1883, p. 311, c. 75] requires the board to do what it is thereby required to do 'by order.'"

Appellants contend that it is the duty of this court in this suit to determine seriatim all the specific and repeated objections made by them to the regularity and alleged illegality of the proceedings taken by the municipality which resulted in the making of the contract or sale of the exclusive franchise to Sharon and his assigns; whether the order was published as required by law; whether the privilege granted was sold to the highest bidder, etc. Can any of these questions be raised or determined in collateral proceedings? Are appellants in a position to question any of these matters in this suit? In the consideration of these questions it must be remembered that appellee did not obtain its franchise from appellants. Its rights and privileges were obtained from the municipality of the city and county of San Francisco.

In Stedman v. City of Berlin, 97 Wis. 505, 509, 73 N. W. 57, which was an action brought by an individual to declare a certain franchise and contract granted and entered into by the city for the construction of waterworks null and void, as beyond the power of the city to make such grant, and to enjoin the city from carrying out the provisions thereof, it was contended by counsel that the franchise and ordinance were illegal and void, because the franchise was not published as required by the statute. The court said:

"We are not called on to determine whether the franchise is void for the want of such publication or for the irregularities pointed out. The contract, it appears, had been completed before this action had been commenced, and the defendant Wheeler had acted under it. * * * The remedy to set aside a franchise irregularly or fraudulently granted, where the party to whom it has been granted is in the exercise of the privileges it confers, is by quo warranto or scire facias at the suit of the state, and not by an equitable action at the suit of private parties. * * * The method of taking advantage of mistakes, irregularities, and illegalities in granting such a franchise is the same substantially as in respect to the formation of corporations, as to which the rule now is, with few exceptions, that no one can question the regularity of an incorporation except the state, where the statute allows an incorporation, and the company has endeavored to incorporate and is acting as a corporation. 1 Cook, Stock (3d Ed.) § 5, and cases cited. The weight of authority is against the remedy in equity in such cases. * * * The granting of a franchise creates a contract between the state and the grantee, and whether the latter has complied with the conditions is a question of fact to be judicially determined. The state can waive strict compliance, and may elect whether or not it will insist upon a forfeiture. The remedy is granted for the injury to the public, and, though there may be an ir-

regularity or mistake, it will not be granted as of course, but only when the public interest demands it."

City of Ashland v. Wheeler, 88 Wis. 607, 617, 60 N. W. 818; Booth, St. Ry. Law, § 44.

In Truckee & T. T. R. Co. v. Campbell, 44 Cal. 89, 91, the plaintiff brought an action to recover tolls, and the defendant contested its right to recover on the ground that the plaintiff was not entitled to its franchise because of certain alleged errors and irregularities in the proceedings of the board granting the franchise. The trial court granted a nonsuit, and the plaintiff appealed. The Supreme Court reversed the judgment. In the course of the opinion the court said:

"It will not be contended that the board did not possess competent authority to determine whether all the requisite facts existed, and whether the corporation had performed all the acts necessary on its part to entitle it to a grant of the right to collect tolls. The authority of the board being conceded, the question whether the board erred in its exercise cannot be raised by a private person; and clearly the inquiry will not be entertained in a collateral proceeding. A grant of such a franchise by a board of supervisors has the same standing in respect to its validity, the presumptions in its favor, and the mode in which it may be attacked, as a grant of any other right, privilege, or thing made by any department of the government under the authority of law. And the rule in all such cases is that the grant is not liable to be attacked by a private person, or in a collateral proceeding, for mere error in the exercise of the authority to make the grant. The inquiry as to whether the plaintiff had properly constructed its road, or whether such road occupied in part a public road, was involved in the proceeding, which resulted in the order of the board granting to the plaintiff the franchise; and the determination of the board in respect to those questions of fact is conclusive in this action, and the defendant will not be permitted to allege or show that the board erred in its determination. Leese v. Clark, 18 Cal. 535; Leese v. Clark, 20 Cal. 387; Bonds v. Hickman, 29 Cal. 460; Bernal v. Lynch, 36 Cal. 135; Durfee v. Plaisted, 38 Cal. 80; Ang. & Ames on Corp. § 636."

Has the right and privilege claimed by appellee herein been forfeited by reason of any act upon its part in overcharging for the destruction of the refuse, garbage, etc., or because appellee, in the enjoyment of its privileges, is maintaining a nuisance? Is this court authorized in this suit to determine whether or not appellee has been guilty of overcharging for cremating the substances heretofore enumerated, and to determine whether or not appellee has continuously or at all operated its works in such a manner as to create a nuisance? The duties imposed upon appellee, as assignee of Sharon, were for the protection of the municipality granting the privileges.

Section 5 of Order No. 2,965 declares that:

"The said grantees, their associates and assigns, on receipt of any of the material or substances specified in this order, shall within twenty-four hours thereafter cremate or reduce the same, or shall subject the same to such process as will secure the complete combustion of all gases or odors arising therefrom; * * * shall maintain and operate their plant and crematory or crematories, or other apparatus, and the matter and substances received, so as to prevent any obnoxious smells or gases being emitted either from the deposits of such matter or substances on their premises or from the process of cremation or other treatment thereof, or from the residuum remaining after cremation or treatment as aforesaid; also, that in the operation of said works no smoke or soot shall be emitted so as to constitute a nuisance."

Section 8 provides that:

"The said grantees, their associates and assigns, shall at all times be subject to and conform to all health and sanitary regulations and requirements enacted and ·in force during the existence of this franchise; * * * shall receive no compensation whatever from the city and county for any service performed under the conditions of this order in disposing of the material and substances specified in this order."

Section 9: "This franchise shall cease and ·determine upon the failure of the grantees, their associates and assigns, to fully carry out and faithfully perform the obligations herein imposed," unless from unavoidable causes or accidents therein mentioned. Is this section self-executing? It is well settled that a party to whom a franchise or privilege has been granted upon conditions to be performed by him must substantially perform them, or he will forfeit the franchise; and in a proper proceeding for that purpose a forfeiture of his rights will be declared, and he will be·ousted of the privilege granted to him. But, as a general rule, advantage can only be taken of such forfeiture in 'proceedings instituted on behalf of the granting authorities, state or municipal, as the case may be. Individuals cannot avail themselves of it in collateral suits until it is judicially determined.

In Utah N. & C. R. Co. v. Utah & C. R. Co. (C. C.) 110 Fed. 879, 889, the court said:

"It is argued by defendants that because of the failure on behalf of this corporation to do the acts therein required within the time therein specified, its rights become ipso facto void; that by the terms of the statute the forfeiture clause was self-operative, and became of full force by the lapse of the time mentioned; and that no steps or proceedings on the part of the sovereign power to make it complete or effective were at all essential. There are numerous cases where, upon the particular facts thereof, it has been held that a statute creating a corporation, which declares that, unless the corporation performs certain acts within the prescribed time, its corporate existence and powers shall cease, or its powers and franchises shall terminate, such statute executes itself. But the fact is that this question is always made dependent upon the special facts, the character of the corporation, and the legal construction to be given to the particular statute. The general 'rule is that the question whether a railroad corporation authorized by the state has forfeited its corporate rights and franchises cannot be raised in any collateral proceeding, and can only be taken advantage of by the sovereign power which created the corporation, because it is its privilege alone to question the right of the corporation to act under its franchise. The state may waive the conditions, or enforce them, if it sees fit to do so."

And cited the following authorities in support of the views therein expressed: Schulenberg v. Harriman, 21·Wall. 44, 62, 22 L. Ed. 551; Van Wyck v. Knevals, 106 U. S. 360, 368, 1 Sup. Ct. 336, 27 L. Ed. 201; Railroad Co. v. McGee, 115 U. S. 469, 473, 6 Sup. Ct. 123, 29 L. Ed. 446, and authorities there cited; Bybee v. Railroad Co., 139 U. S. 663, 674, 11 Sup. Ct. 641, 35 L. Ed. 305, and authorities there cited; Atlantic & P. R. Co. v. Mingus, 165 U. S. 413, 431, 17 Sup. Ct. 348, 41 L. Ed. 770; U. S. v. Northern Pac. R. Co., 177 U. S. 435, 20 Sup. Ct. 706, 44 L. Ed. 836.

In Bybee v. Railroad Co., supra, the court, after drawing the distinction existing between certain of the New York and California cases, holding the forfeiture clauses to be self-executing, referred to

the fact that the doctrine of these case had not been universally accepted; and that under the facts there stated the principles therein announced have been repudiated in several states of the Union, and said:

"It is not, indeed, always easy to determine whether a condition be precedent or subsequent. It must depend wholly upon the intention of the parties as expressed in the instrument and the facts surrounding its execution. If the condition does not necessarily precede the vesting of the estate, or if, from the nature of the act to be performed and the time required for its performance, it is evident that the intention of the parties is that the estate shall vest, and the grantee shall perform the act after taking possession, then the condition is treated as subsequent, and there is no forfeiture without a reentry by the grantor, or, in the case of the state, without some action on its part manifesting an intention to resume its title."

The California decisions cited by appellant, wherein it is held that certain clauses in the grant or privilege there under consideration have been held self-executing, viz., Borland v. Lewis, 43 Cal. 569; Oakland R. Co. v. Oakland, etc., R. Co., 45 Cal. 365, 13 Am. Rep. 181; Upham v. Hosking, 62 Cal. 250; Town of Arcata v. Arcata Ry. Co., 92 Cal. 639, 28 Pac. 676—are certainly not conclusive, or of binding force upon this subject, and it would therefore serve no useful purpose to review them. They are not uniform and have been criticised in the later decisions.

In Santa Rosa City R. Co. v. Central Ry. Co. (Cal.) 38 Pac. 986, 990, the court, in referring to the decisions cited by appellant said, they "are not altogether consistent with each other, nor in harmony with the decisions elsewhere." A majority of the justices favored the views we have expressed, and referred to numerous authorities in the state courts in support thereof. Two justices dissented therefrom, a rehearing was granted, and the justices were evenly divided, and the court declared that it was impossible "to arrive at a conclusion upon the merits of the case." Santa Rosa City R. R. v. Cent. Ry. Co., 112 Cal. 436, 44 Pac. 733. We have, therefore, been compelled to look elsewhere for the true rule that should govern the interpretation of the forfeiture clauses contained in Order No. 2,965. It is questionable, to say the least, whether the evidence given in this case upon this subject would, in any event, sustain a forfeiture, even in a direct proceeding instituted by the city for that purpose. There was no excess of the rate charged—20 cents per cubic yard—authorized by the provisions of the order. The questions presented relate solely to the differences of opinion between appellee and the scavengers as to how the garbage should be measured—whether appellee is entitled to measure the refuse matter in bulk, in its natural condition, without being compressed by artificial means. Whatever differences of opinion may be found in the decisions concerning the general rule as to forfeitures, it is manifest that the arguments based upon the alleged overcharge cannot be sustained. Such a controversy as is here presented cannot be urged as a ground of forfeiture in this suit.

Upon the other ground—that appellee is maintaining a nuisance—there is also a decided difference of opinion between the witnesses as to whether or not the crematory of appellee had been so managed

or operated "as to prevent any obnoxious smells or gases," or whether, in the operation of said works, any smoke or soot had been emitted therefrom so as to constitute a nuisance. Surely, there is nothing in the facts of this case, nor in any well-settled principle of law applicable to such facts, that will authorize this court to determine these questions in a collateral proceeding.

It is contended that the right and privilege claimed by appellee does not prohibit the removal of house refuse and garbage beyond the territorial limits of the municipality; that the only privilege granted is that all house refuse and garbage disposed of within the city should be delivered to the crematory. This position cannot be maintained. In order to ascertain the true intent and meaning of the board of supervisors in passing Order No. 2,965, all of the sections must be considered together as a whole, and the object and purposes of passing the order must also be considered. A broad and liberal construction should always be given to acts and ordinances of this character in order to carry out their provisions and give effect to the intention of the parties, and to secure and make effective the object to be accomplished thereby. The language used in the order, interpreted in the light of these considerations, is not susceptible of the narrow and technical construction sought to be placed upon it by appellants. We have not deemed it necessary to quote the entire order. It has already been sufficiently referred to. Its preamble declares the necessity, and gives reasons why the sole right and privilege to cremate garbage, etc., should be given. Section 1 confers upon Sharon and his assigns the sole and exclusive right and privilege to cremate and destroy "within the city" the refuse therein named, and to charge and collect the amount named therefor at the crematory or reduction plant. The words "within the city and county," as used in the order, have reference to the right to build the crematory within the city and county, and cannot fairly be construed as reserving the right and privilege to others to remove and dispose of the garbage "without the city and county." The order of the board should, like the provisions of a statute, receive a sensible construction, and should not be interpreted so as to lead to an absurdity. The reason of the law in such cases should prevail over its strict letter. Tsoi Sim v. United States, 116 Fed. 920, 926, 54 C. C. A. 154, and authorities there cited. How could the order which gives "the sole right and privilege" to cremate all the garbage, etc., within the city be construed as allowing rival parties to destroy the privilege thus granted by gathering the garbage and transporting it without the city? Can it sensibly be said that such was the intention of the board in passing the order?

In the light of the conclusions reached upon this point, it becomes unnecessary to discuss the provisions of Order No. 12, which more clearly expresses the intention of the board upon this subject.

The decree of the Circuit Court is affirmed.